UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

UNITED STATES OF AMERICA,

      Plaintiff,

v.

0.1785 ACRES OF LAND, MORE OR            Civil Action No. 2:24-cv-23
LESS, SITUATE IN CHESAPEAKE
VIRGINIA, AND MSF INVESTORS II,
LLC, ET AL.,

      Defendants.

**OPINION AND ORDER**

This matter is before the court on Defendants MSF Investors II, LLC and Arcadia Equity

Associates' ("Landowners") Motion in Limine to Exclude Testimony of the United States' rebuttal

experts, Steve Schmidt and Nancy Dove, (ECF No. 96). Landowners argue that Schmidt, a traffic

engineer, and Dove, a real estate appraiser, should be excluded because their opinions (1) only

discuss the "general benefits" rather than the "special benefits" connected to Landowners'

remaining property after condemnation, (2) are not connected to the valuation of the property, and

(3) are speculative and lack adequate foundation. Defs.' Mem. Supp. Mot. Exclude Test.

("Landowners Mem.") (ECF No. 97). The United States claims that both Schmidt and Dove based

their opinions on relevant experience and publicly available data, and offer admissible rebuttal

evidence rather than "special benefits" testimony meant to value the land. United States' Opp'n

Defs.' Mot. Exclude Test. ("Opp'n") (ECF No. 98). Landowners reply, reiterating that both

Schmidt and Dove offer improper special benefits testimony without any evidence that the benefits

have value specific to the property, and that both witnesses intend to offer "simply late disclosed

1

new opinions." Defs.' Reply Mem. Supp. Mot. Exclude Test. ("Landowners Reply") (ECF No. 99, at 1, 6). On August 27, 2025, the court heard arguments of counsel via Zoom. For the reasons stated at the hearing and explained below, the court DENIES Landowners' Motion.

## I.    BACKGROUND

### A.    The Subject Property and Project

During a construction project replacing the Deep Creek Bridge to improve access to nearby roadways in the City of Chesapeake, Virginia ("Project"), the United States condemned Landowners interests in 0.1785 acres of land along with related temporary easements. See Landowners Mem. (ECF No. 97, at 2); Opp'n (ECF No. 98, at 2). The government's taking impacts two parcels of land—Parcel 126 and Parcel 127—that are adjacent to the Crossings at Deep Creek Shopping Center ("Shopping Center"), a Food Lion-anchored shopping center located along the Moses Grandy Trail roadway. See Landowners Mem. (ECF No. 97, at 3); Opp'n (ECF No. 98, at 2). Both parcels have three points of ingress and egress: (1) the "Western Entrance" along the Moses Grandy Trail, which acted as the main entrance allowing drivers to make a full-movement turns in any direction before the Project; (2) the "Eastern Entrance" allowing drivers to turn right in or out onto the Moses Grandy Trail; and (3) the "Southern Entrance" on George Washington Highway. See Landowners Mem. (ECF No. 97, at 3); Opp'n (ECF No. 98, at 2-3).

As part of the Project, the United States will "replace an obsolete 90-year-old two-lane bridge with a new five-lane drawbridge," widen parts of the Moses Grandy Trail, install a traffic signal at the Intersection to include a "new left-turn-only lane for northbound George Washington Highway traffic onto westbound Moses Grandy Trail," install a pork chop traffic island at the Western Entrance, and make "other improvements to enhance traffic flow and

2

safety." Opp'n (ECF No. 98, at 4). Because of the new traffic control efforts, drivers will no longer be able to make a left out of the Western Entrance to the parcels; instead, they will have to either take a right onto Moses Grandy Trail and then turnaround elsewhere, or they have to turn right out of the Southern Entrance and then turn left at the newly signalized Intersection to head west. See Landowners Mem. (ECF No. 97, at 4); Opp'n (ECF No. 98, at 5).

The sole issue at trial is the amount of just compensation owed to Landowners for the government's taking. Landowners Mem. (ECF No. 97, at 1); Opp'n (ECF No. 98, at 5). Just compensation is determined by the difference in property value before and after a taking, accounting for any specific damage or benefit to the property. See United States v. Petty Motor Co., 327 U.S. 372, 377 (1946). Although the amount of land taken is not in controversy, Landowners and the United States disagree about the effect of the Project's changes on the land valuation. Each party relies on their own expert appraiser to determine the value of the land and the just compensation owed. Landowners Mem. (ECF No. 97, at 2); Opp'n (ECF No. 98, at 5).

**B.    The Parties' Experts**

Both valuation experts apply the same methodology to value the take, preparing a value for the affected properties before and after the Project. See Petty Motor Co., 327 U.S. at 377. The United States' expert appraiser, Lawrence Colorito, estimated just compensation for Landowners to be $50,000.[1] Landowners Mem. Ex. 6, at 171 ("Colorito Parcel 126 Report") (ECF No. 97-6, at 5); Landowners Mem. Ex. 7, at 98 ("Colorito Parcel 127 Report") (ECF No. 97-7, at 5). Landowners' expert appraiser, Matthew Ray, values the taking at $1,175,000 and

---

[1] This motion does not challenge Colorito's appraisal. Relevant to this motion, Colorito concludes "the widening of the bridge and installation of the traffic light is expected to ease the flow of traffic through the neighborhood; however, there is no quantifiable impact on the value of the subject property." Colorito Parcel 126 Report, at 144 (ECF No. 97-6, at 6); Colorito Parcel 127 Report, at 98 (ECF No. 97-7, at 7). His report does not characterize any of the improvements to the land post-take as a special benefit; in fact, his report states "[t]here are no known special benefits." Colorito Parcel 126 Report, at 171 (ECF No. 97-6, at 8); Colorito Parcel 127 Report, at 98 (ECF No. 97-7, at 7).

supports his valuation with Landowners' traffic engineer, Dexter Williams', report. Opp'n Ex. 12 ("Ray Parcel 126 Report") (ECF No. 98-2); Opp'n Ex. 13 ("Ray Parcel 127 Report") (ECF No. 98-3). To rebut Landowners' experts, the United States seeks to introduce testimony from two rebuttal experts, Nancy Dove and Steve Schmidt. Given that Dove and Schmidt's rebuttal opinions are at issue here, it is also important to understand the expert testimony they rebut—Ray's appraisal and Williams' traffic report.

### 1.    Matthew Ray's Expert Report

Matthew Ray, Landowners' appraiser, conducted two appraisals for Parcels 126 and 127—estimating the market value of the subject property before the taking[2] and the remainder property after the taking[3]—and concluded that the value of the land and other interests taken is $1,175,000.[4] Opp'n (ECF No. 98, at 6). In determining this value, Ray focused on the Project's elimination of a left turn out of the Western Entrance. Id. His report also relied on Dexter Williams' traffic report, discussed further below, which measured the changes to entrance throat length and exit lane storage capacity under the City of Chesapeake requirements and Virginia Department of Transportation ("VDOT") requirements to support his land valuation estimates.

---

[2] In this case, "[d]ue to the physical characteristics of the subject property, along with its excellent location, allowable uses and surrounding improvements, commercial development is identified as the highest and best use." Ray Parcel 126 Report, at 38 (ECF No. 98-2, at 14); Ray Parcel 127 Report, at 37 (ECF No. 98-3, at 14). Ray's report states that the value of Parcel 126 before the taking was $10,250,000. Ray Parcel 126 Report, at 92 (ECF No. 98-2, at 21). The value of Parcel 127 before the taking was $1,300,000. Ray Parcel 127 Report, at 69 (ECF No. 98-3, at 21).

[3] Ray's report "value[s] the remainder property after the taking using the Income Approach and the Sales Comparison Approach," which yielded the values $9,480,000 and $8,965,000 respectively. Ray Parcel 126 Report, at 92 (ECF No. 98-2, at 21). After considering each approach, Ray found the market value of Parcel 126 to be $9,375,000 after the taking. Id. The difference in value post-take, thus, is $875,000 for Parcel 126. Id. For Parcel 127, Ray's report concludes the value of the remainder property after the taking is $1,000,000. Thus, the difference in value post-take for Parcel 127 is $300,000. Ray Parcel 127 Report, at 69 (ECF No. 98-3, at 22).

[4] Ray finds that "the taking lowered the value of Parcel 126 by $875,000 and Parcel 127 by $300,000, producing his overall valuation of $1,175,000." Opp'n (ECF No. 98, at 8) (citing Ray 126 Report, at 3, 92 (ECF No. 98-2, at 2, 21); Ray 127 Report, at 3, 69 (ECF No. 98-3, at 3, 22)).

See Ray Parcel 126 Report, at 22-25 (ECF No. 98-2, at 8-11); Ray Parcel 127 Report, at 23-25 (ECF No. 98-3, at 9-11).

By comparing the increase in vehicles, and loss in site efficiency after the take by eliminating access to the Shopping Center through "full-movement turns" from the Western Entrance, Ray's report concluded that "egress from the property as well as internal site circulation are inferior" post-take because "there will be an increase in vehicle stacking and queuing at the [Southern Entrance] for those vehicles which need to proceed west from the subject property." Ray Parcel 126 Report, at 7, 81 (ECF No. 98-2, at 7, 17); see also Ray Parcel 127 Report, at 6-7, 58 (ECF No. 98-3, at 6-7, 20); Opp'n (ECF No. 98, at 6). He also concluded that there are no special benefits for the remainder property after the taking because "any benefits of the bridge project are enjoyed by the community as a whole." Ray Parcel 126 Report, at 92 (ECF No. 98-2, at 21); Ray Parcel 127 Report, at 69 (ECF No. 98-3, at 22). Instead of isolating each harm—from vehicle stacking or the loss of full movement turns—to determine their purported impact, Ray values the land after the take by accounting for all the harm together. Opp'n (ECF No. 98, at 8).

Although his report focuses on the ability of drivers to turn left from the Western Entrance, Ray does not discuss the safety concerns of turning left onto Moses Grandy Trail. Id. at 6. He also "mistakenly believed the [nearby] Intersection was signalized before the taking" in his analysis. Id. at 7 (citing Ray Parcel 126 Report, at 30 (ECF No. 98-2, at 12); Ray Parcel 127 Report, at 46-47 (ECF No. 98-3, at 14-15); Opp'n Ex. 15 ("Ray Dep.") 22:4-22 (ECF No. 98-5)). Additionally, Ray's report does not "analyze traffic counts at the Shopping Center, the necessary gap in traffic needed to make [a left turn at the Western Entrance], how long an exiting vehicle

must wait for an opportunity to make that turn, or how many accidents occurred at that entrance. Id. at 7 (citing Ray Dep. 21:22-22:3, 57:6-58:3 (ECF No. 98-5)).

### 2. Dexter Williams' Expert Report

Dexter Williams, Landowners' traffic engineer, provided a report measuring the "entrance throat length"[5] and "exit lane storage capacity"[6] for the Shopping Center's entrances before and after the taking. Opp'n Ex. 16 ("Williams Report") (ECF No. 98-6, at 1-3). In his report, Williams notes the difference in the City of Chesapeake's measurement requirements and VDOT's measurement requirements. Id. But the report does not involve any traffic analysis such as the intensity of use of the three entrances to the Shopping Center, the number of vehicles turning onto Moses Grandy Trail, the frequency of accidents for vehicles turning left from the Western Entrance, or other changes to traffic flow after the Project added a traffic signal and altered entrances and exits onto Moses Grandy Trail. Opp'n Ex. 17 ("Williams Dep.") 36:12-48:5 (ECF No. 98-7); see also Opp'n (ECF No. 98, at 8). Although Williams' report serves to support some conclusions made in Ray's report, see Ray Parcel 126 Report, at 22-25 (ECF No. 98-2, at 8-11); Ray Parcel 127 Report, at 23-25 (ECF No. 98-3, at 9-11), Williams' opinion on the reduction in exit lane storage capacity does not offer a value of the subject property post-take, or a specific diminished value caused by the traffic issues he described. Williams Dep. 36:1-36:9 (ECF No. 98-7).

### 3. Nancy Dove's Expert Report

Nancy Dove is a "licensed real estate appraiser with over 20 years of experience appraising commercial properties." Opp'n (ECF No. 98, at 9) (citing Opp'n Ex. 18 ("Nancy

---

[5] An entrance throat length must maintain a minimum distance "to avoid entering traffic from backing onto public street by on site traffic or exiting traffic blocking the entering traffic movement." Williams Report (ECF No. 98-6, at 1).

[6] Although the entrance throat length encompasses most of the area for on-site storage capacity for exiting lanes of traffic, the exit land storage capacity also separates exiting traffic from other site traffic. Id.

Dove Curriculum Vitae") (ECF No.98-8)). For this Project, Dove produced two rebuttal expert reports, one for each parcel of land at issue. Opp'n Ex. 2 ("Dove Parcel 126 Report) (ECF No. 97-2); Opp'n Ex. 3 ("Dove Parcel 127 Report") (ECF No. 97-3); Opp'n (ECF No. 98, at 9). Both reports identify flaws in Ray's methodology and assert he failed to apply industry standards. See generally Dove Parcel 126 Report (ECF No. 97-2); Dove Parcel 127 Report (ECF No. 97-3). Dove reached her conclusion by reviewing Ray's reports[7] in-depth against foundational appraisal texts like the Uniform Standards of Professional Appraisal Practice ("USPAP") and the Uniform Appraisal Standards for Federal Land Acquisitions ("USFLA" or "Yellow Book"), see Dove Parcel 126 Report (ECF No. 97-2); Dove Parcel 127 Report (ECF No. 97-3); Opp'n (ECF No. 98, at 9), sources that Ray agrees are authoritative in the appraisal industry, Ray Dep. 11:19-13:18 (ECF No. 98-5).

Upon review, Dove determined that "Ray did not rely on sufficient or sound data to reach his conclusions, misapplied appraisal methodologies, or made-up new methodologies with no basis in appraisal practice." Opp'n (ECF No.98 at 9) (citing Dove Parcel 126 Report (ECF No. 97-2, at 4-5, 10-15, 18-21); Dove Parcel 127 Report (ECF No. 97-3, at 4, 7-9, 12-16)). Although she acknowledges that Ray relied on Williams' traffic report, she concludes that Ray "failed to explain how these changes in 'entrance throat length' measurements and 'storage capacity' calculations equate to a diminution in value of the shopping center," and that he "makes an illogical leap [to] assume[] these changes lower the value of the shopping center" instead. Dove Parcel 126 Report (ECF No. 97-2, at 19); Dove Parcel 127 Report (ECF No. 97-3, at 12).

To demonstrate how Ray's alleged errors inflated the value of the condemned property,

---

[7] Dove analyzes the details of the determined highest and best use under both the Income Capitalization Approach and the Sales Comparison Approach that Ray used to inform his report. Ray Parcel 126 Report, at 92 (ECF No. 98-2, at 21); Ray Parcel 127 Report, at 69 (ECF No. 98-3, at 22).

Dove conducted her own research. Opp'n (ECF No. 98, at 9). As part of her research, Dove found that before the Project, "vehicles wishing to turn left from the [Western Entrance] would need to cross two lanes of traffic coming west bound and two lanes flowing east bound (one going straight and one left-turn only lane onto Diamond Avenue)." Dove Parcel 126 Report (ECF No. 97-2, at 18); Dove Parcel 127 Report (ECF No. 97-3, at 11). She concludes that after the Project, the new traffic signal "will make the [I]ntersection much more efficient," which she claims Ray failed to consider when analyzing the "downsides of the removing the left turn at the [W]estern [E]ntrance". Dove Parcel 126 Report (ECF No. 97-2, at 19); Dove Parcel 127 Report (ECF No. 97-3, at 12).

Further, Dove's written report notes that Ray's special benefits analysis was conclusory as a thorough investigation of the Project's benefits, including the new traffic signal, widening of the bridge, and the improved traffic flow, could provide special benefits. Opp'n (ECF No. 98, at 10) (citing Dove Parcel 126 Report (ECF No. 97-2, at 20-21)). Notably, though, Dove does not conclude herself that the Project offered special benefits to the Shopping Center, only that Ray's "conclusion [is] not reliable." Id.

### 4.    Steve Schmidt's Expert Report

Steve Schmidt, from the Timmons Group, is a "licensed traffic engineer, professional traffic operations engineer, and a certified planner." Landowners Mem. Ex. 10 ("Schmidt Dep.") 7:23-8:11 (ECF No. 97-10).[8] Schmidt prepared a fifteen-page rebuttal access assessment report related to the subject property, reviewing Ray's and Williams' reports in depth, (ECF No. 97-1). Schmidt's assessment "disagrees with [Ray's] that egress from the property and internal site

---

[8] Given that Schmidt's qualifications are not in question, this opinion does not dive further into his twenty years of experience conducting and managing traffic studies. However, for a more in-depth summary of his credentials, see Landowners Mem. Ex. 1 ("Schmidt Resume") (ECF No. 97-1, at 16); see also Schmidt Dep. 7:23-8:11 (ECF No. 97-10).

circulation [will be] inferior in the after condition," and concludes that Williams' report contained errors leading to an unsupported measurement of exit storage lane capacity. Landowners Mem. Ex. 1 ("Schmidt Report") (ECF No. 97-1, at 1, 4, 9-13). Although the Project will limit left turns from the Western Entrance, Schmidt concludes that "travel time for vehicles heading westbound on Moses Grandy Trail will be reduced" due to the new traffic signal at the Intersection. Schmidt Report (ECF No. 97-1, at 1-2, 4).

To support his conclusion, Schmidt identifies factors that improve traffic circulation and safety concerns, which he opines were overlooked by Landowners' experts. See Schmidt Report (ECF No. 97-1, at 4-9). Before the Project, Schmidt opines that the "queuing and congestion on the surrounding roadways made an unsignalized left turn … challenging" and caused long delays. Id. at 4. His analysis, based on the 2023 VDOT Average Daily Traffic data, concludes that "one vehicle arriv[es] approximately every three seconds" along the Western Entrance. Id. Additionally, based on a report published by the US Department of Transportation and National Highway Traffic Safety Administration in June 2020, Schmidt finds that "[t]he minimum time gap that a driver needs to safely turn left across or into traffic is approximately 7.1 seconds on average for passenger cars." Id. After the Project, Schmidt concludes that the addition of a traffic signal will reduce the delay in exiting the Shopping Center. Id. at 5-6.

Schmidt's report also states that both Landowners' experts overlook safety concerns and crash history for entrances to the Shopping Center before the Project. Id. at 6. After reviewing VDOT crash data, Schmidt concludes that the Project will reduce opportunities for potential collisions by adding a dedicated, signalized left turn. Id. at 7-9. As with the Williams report, Schmidt does not himself place a value on any traffic improvements but argues Williams'

erroneous calculation of exit lane storage capacity and Ray's failure to consider traffic circulation and safety, undermine Landowners' experts' conclusions on value.

## B.     Current Motion

Landowners moved to exclude Schmidt and Dove's testimony entirely, arguing that their opinions "1) are not connected to any valuation testimony; 2) regard only 'general benefits' enjoyed by the public at large, rather than 'special benefits' that accrue to the owners' remaining property as a result of the public use Project for which the property has been condemned; and 3) are speculative and lack an adequate foundation and basis." Landowners Mem. (ECF No. 97, at 2). The United States opposed Landowners' motion, claiming that Schmidt and Dove's opinions serve as admissible rebuttal evidence rather than special benefits testimony tied to any increase in the value of the land. Opp'n (ECF No. 98). The United States asks the court to reject Landowners' argument because Landowners "misstate the law, misinterpret the record, and [accepting it] would allow faulty opinions of the landowners' experts to proceed unchecked." Id. at 1. Landowners' reply argues that Schmidt and Dove's opinions "are not rebuttal or predicate opinion but simply late disclosed new opinions" that are still incomplete and inadmissible special benefits testimony. Landowners Reply (ECF No. 99, at 1, 6).

## II.     STANDARD OF REVIEW

The purpose of a motion in limine is "to allow a court to rule on evidentiary issues in advance of trial in order to avoid delay, ensure an even-handed and expeditious trial, and focus the issues the jury will consider." United States v. Verges, No. 1:13-cr-222, 2014 U.S. Dist. LEXIS 17969, 2014 WL 559573, at *3 (E.D. Va. Feb. 12, 2014). "Questions of trial management are quintessentially the province of the district courts," United States v. Smith, 452 F.3d 323, 332 (4th Cir. 2006), and thus, the court has broad discretion when considering a motion in limine. See

10

Kauffman v. Park Place Hosp. Grp, 486 F. App'x 220, 222 (4th Cir. 2012). A motion in limine to exclude evidence "should be granted only when the evidence is clearly inadmissible on all potential grounds." Verges, 2014 WL 559573, at *3. Relevant evidence is admissible at trial unless its probative value is substantially outweighed by a danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed R. Evid. 403. In an eminent domain proceeding, speculative evidence that does not impact the subject property's value is not relevant and is thus inadmissible. Olson v. United States, 292 U.S. 246, 257 (1934) ("Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable should be excluded from consideration for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value.").

In determining the admissibility of expert witness testimony, Rule 702 of the Federal Rules of Evidence governs. United States v. Wilson, 484 F.3d 267, 274-75 (4th Cir. 2007). Under the Rule:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. In other words, expert testimony is admissible under Rule 702 "if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the jury or other trier of

fact to understand or resolve a fact at issue." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 260 (4th Cir. 1999) (citing Daubert v. Merrell Dow Pharm., 509 U.S. 579, 592 (1993)).

The first prong requires the court to examine "whether the reasoning or methodology underlying the expert's proffered opinion is reliable" and the second prong asks the court to analyze "whether the opinion is relevant to the facts at issue." Id.; see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999) ("[T]he Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" (quoting Daubert, 509 U.S. at 597)); Oglesby v. General Motors Corp., 190 F.3d 244, 249-50 (4th Cir. 1999) ("[A] district judge, considering a proffer of expert testimony under Federal Rule of Evidence 702—whether based on scientific, technical, or other knowledge—must, in determining its admissibility, ensure that the evidence is 'not only relevant, but reliable'" (quoting Daubert, 509 U.S. at 589)). That is, "a reliable expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." Oglesby, 190 F.3d at 250 (citing Daubert, 509 U.S. at 590, 592-93). "The proponent of the testimony must establish its admissibility by a preponderance of proof." Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001) (citing Daubert, 509 U.S. at 592 n.10).

Thus, the District Court serves as a gatekeeper to assess whether the proffered evidence is reliable and relevant. Kumho Tire Co., 526 U.S. at 141. But the gatekeeper function does not require that the Court "determine that the proffered expert testimony is irrefutable or certainly correct" because expert testimony is "subject to testing by 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" United States v. Moreland, 437 F.3d 424, 431 (4th Cir. 2006) (quoting Daubert, 509 U.S. at 596). There is no

"mechanistic test for determining the reliability of an expert's proffered testimony; on the contrary, 'the test of reliability is flexible and the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.'" Peters-Martin v. Navistar Int. Trans. Corp., 410 F. App'x 612, 617 (4th Cir. 2011) (quoting United States v. Wilson, 484 F.3d 267, 274 (4th Cir. 2007)) (internal citations and quotations omitted).

The text of Rule 702 explicitly contemplates experiential experts. Fed. R. Evid. 702 (listing "experience" as an expert qualification"); see also Fed. R. Evid. 702 advisory committee's note ("Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony."). "Purely scientific testimony . . . is characterized by 'its falsifiability, or refutability, or testability.'" Wilson, 484 F.3d at 274 (quoting Daubert, 509 U.S. at 593). But experiential expert testimony does not "rely on anything like a scientific method," causing the district court's role in "examining the reliability of experiential expert testimony" to become "somewhat more opaque." Id. (citing Fed. R. Evid. 702 advisory committee's note). Nevertheless, the court's gatekeeping role "is to 'make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Cooper, 259 F.3d at 200 (citing Kumho Tire, Co., 526 U.S. at 152). Therefore, courts must still require an experiential expert to "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." Wilson, 484 F.3d at 274 (quoting Fed. R. Evid. 702 advisory committee's note) (alterations in original).

### III.    ANALYSIS

In this motion to exclude the United States' experts, Landowners do not challenge Schmidt and Dove's credentials.  Opp'n (ECF No. 98, at 16).  Rather, Landowners argue that the United States' experts fail to establish the Project conferred "special benefits" to the subject property and failed to value of any potential benefits they describe.  Landowners Mem. (ECF No. 97).  This argument improperly characterizes the Plaintiff's experts' opinions as "special benefits testimony," which it is not.  Both experts offer rebuttal evidence to directly refute Landowners' experts' valuation of damages by identifying factors they believe that Landowners' experts failed to consider.  After considering all the expert reports, I find that Plaintiff has met its burden to show that both Schmidt and Dove offer admissible testimony as rebuttal evidence, and therefore DENY the Defendants' Motion.  (ECF No. 96).

**A.    The United States Offers Schmidt and Dove's Expert Opinions as Rebuttal Evidence to Refute Landowners' Experts' Opinion on Access to the Land and its Valuation of the Land**

Both Schmidt and Dove focus on how the Project improves access to the land in question and directly contradict the Landowners' experts' opinions that access would be diminished.  See Schmidt Report (ECF No. 97-1); Dove Parcel 126 Report (ECF No. 97-2); Dove Parcel 127 Report (ECF No. 97-3).  In general, a testifying expert qualifies as either an initial or affirmative expert or a rebuttal expert.  An initial or affirmative expert serves to establish a party's case-in-chief, while a rebuttal expert provides "[e]vidence offered to disprove or contradict the evidence presented by an opposing party." Black's Law Dictionary 702 (11th ed. 2019)); see also United States v. Stitt, 250 F.3d 878, 897 (4th Cir. 2001) ("Rebuttal evidence is defined as '[e]vidence given to explain, repel, counteract, or disprove facts given in evidence by the opposing party.  That which tends to explain or contradict or disprove evidence offered by the adverse party.'"

(quoting Black's Law Dictionary 1267 (6th ed.1990))). Rebuttal evidence for a "fact ... of consequence in determining the action" is relevant because it "has [a] tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401.

In offering rebuttal evidence, expert testimony can "direct the finder of fact to a different form of analysis or set of facts" that relate to the topics discussed by the opposing expert. Houston Cas. Co. v. Trident Constr. Servs., LLC, No. 2:22-cv-2037, 2023 WL 8713370, at *2 (D.S.C. Dec. 18, 2023); see also Rockwell Mining, LLC v. Pocahontas Land LLC, No. 2:20-cv-487, 2022 WL 533053, at *6-7 (S.D.W. Va. Feb. 22, 2022) (allowing rebuttal opinions to refute opposing expert opinions with additional information and identification of the opposing expert's "failure to analyze" material facts or issues). Rebuttal expert reports can do so by "cit[ing] new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert. Funderburk v. S.C. Elec. & Gas. Co., No. 3:15-cv-4660, 2019 WL 3406814, at *4 (D.S.C. July 9, 2019) (quoting Glass Dimensions, Inc. v. State St. Bank & Tr. Co., 290 F.R.D. 11, 16 (D. Mass. 2013)).

Schmidt and Dove are qualified experts that directly refute one central premise of Ray's valuation—that the Project harms the value of the remaining parcels by impeding egress from the property and internal site circulation. Ray Parcel 126 Report, at 7, 81 (ECF No. 98-2, at 7, 17); see also Ray Parcel 127 Report, at 6-7, 58 (ECF No. 98-3, at 6-7, 20). Specifically, Ray's report concludes that removing the left turn option from the Western Entrance will make it harder for customers to travel west onto Moses Grandy Trail because he assumes it is easier for drivers to make a left onto Moses Grandy Trail before the Project rather than making a right turn at the Southern Entrance to turn left at the newly signalized Intersection. Ray Parcel 126 Report, at 7, 81 (ECF No. 98-2, at 7, 17); see also Ray Parcel 127 Report, at 6-7, 58 (ECF No. 98-3, at 6-7,

15

20).  Both Schmidt and Dove note that Ray's report did not account for the difficulty of making a left onto Moses Grandy Trail before the Project, and the changes to traffic volume, patterns, and safety with the installation of a new traffic signal at the Intersection.  Schmidt Report (ECF No. 97-1, at 4-9); Dove Parcel 126 Report (ECF No. 97-2, at 18-19); Dove Parcel 127 Report (ECF No. 97-3, at 11-12).  Additionally, they both note that Ray's report relies on Williams' allegedly erroneous calculation of the lane capacity.  Schmidt Report (ECF No. 97-1, at 9-13); Dove Parcel 126 Report (ECF No. 97-2, at 19); Dove Parcel 127 Report (ECF No. 97-3, at 12).  Thus, both Schmidt and Dove offer opinions which directly refute Landowners' experts.

For Dove's opinions specifically, Landowners seek to exclude her testimony since she concludes that there may be benefits from the Project to the subject property, which Landowners characterize as "special benefits" testimony.  Landowners Mem. (ECF No. 97, at 16).  However, Dove's report arrives at this conclusion by attacking Ray's opinions on value and his analysis about the Project's changes in access to the Shopping Center.  The portion of Dove's report titled "Explanation of Special Benefits" details Ray's conclusion "that there are no special benefits estimated for the remainder property after the taking," before refuting the conclusion by identifying potentially beneficial attributes of the Project.  Dove Parcel 126 Report (ECF No. 97-2, at 20-21).  Rather than arguing that there are special benefits, Dove's report rebuts Ray's report by criticizing it for "simply stat[ing] that there are no special benefits, without considering the addition of this traffic signal, render[ing] Mr. Ray's unsupported conclusion not credible."  Id.

Since Dove and Schmidt's reports directly refute Landowners' experts by identifying omissions and errors, their testimony is admissible.  See United States v. Stitt, 250 F.3d 878, 897 (4th Cir. 2001); Houston Cas. Co. v. Trident Constr. Servs., LLC, No. 2:22-cv-2037, 2023 WL

16

8713370, at *2 (D.S.C. Dec. 18, 2023); Rockwell Mining, LLC v. Pocahontas Land LLC, No.

2:20-cv-487, 2022 WL 533053, at *6-7 (S.D.W. Va. Feb. 22, 2022).

**B.    Schmidt and Dove's Expert Opinions Rebut Landowners' Experts and Do Not Value Any Special Benefits to the Remaining Property**

Landowners' main argument to exclude Schmidt and Dove's testimony is that both

experts describe only general benefits rather than special benefits specifically tied to

Landowners' remaining property.  Landowners Mem. (ECF No. 97, at 10-17).  For Schmidt's

testimony, Landowners contend that he relies on "overall Project improvements, the very reasons

for the Project, which will be enjoyed by the public at large, to argue that the Project improves

the specific conditions on Landowners property."  Id. at 14.  Moreover, Landowners claim that

Schmidt's expected testimony about the congestion on surrounding roadways of the Western

Entrance, the new traffic signal at the Intersection, and traffic safety near the property are not

relevant in determining special benefits since they do not pertain to the property specifically.  Id.

at 14-15.  Landowners likewise contend that any potential benefits outlined in Dove's opinion

are not distinguished from the benefits to the general public.  Id. at 16.  But Dove and Schmidt's

critique of Landowners' experts' failure to account for traffic improvements does not convert

their testimony to opinions on the value of special benefits.

Remainder property benefits from a taking when the taking "enhances the present value

of condemnee's remainder such that it has a greater value after the taking than before." 3 Nichols

on Eminent Domain, Ch. 8A, § 8A.02[2] (Matthew Bender. 3d ed. 2010).  Benefits to a property

can be special, meaning that the "market value of the remainder…advanced beyond the mere

general appreciation of the property in the neighborhood," so long as evidence of the benefits are

not speculative.  Id.  "Benefits that inure to the community at large, from the public work are to

be considered 'general' and do not impact just compensation."  Price v. United States, 175

17

Fed.Cl. 1, 34 (2025).  Landowners claim that "to introduce evidence of any enhancement in this case, the [United States] must show … benefit(s) [that] are specific or particular to Landowners' properties and are not provided similarly to the surrounding properties or to the community as a whole." Landowners Mem. (ECF No. 97, at 5).  However, in <u>United States v. River Rouge Improvement Co.</u>, the United States Supreme Court held that improved access to a stream by widening a river "would constitute a special and direct benefit … although the remaining portions of other … parcels would be similarly benefited." 269 U.S. 411, 415-16 (1926).  The Supreme Court cited a state court opinion that held:

> The benefit is not less direct and special to the land of the petitioner, because other estates upon the same street are benefitted in a similar manner.  The kind of benefit which is not allowed to be estimated for the purpose of such a deduction, is that which comes from sharing in the common advantage and convenience of increased public facilities, and the general advance in value of real estate in the vicinity by reason thereof.  The advantages of more convenient access to the particular lot of land in question, and of having a front upon a more desirable avenue, are direct benefits to that lot, giving it increased value in itself. It may be the same, in greater or less degree, with each and every lot of land upon the same street. But such advantages are direct and special to each lot. They are in proper sense common because there are several estates, or many even, that are similarly benefited.

Id. at 416 (quoting Allen v. Charlestown, 109 Mass. 243, 246 (1872)).  Thus, special benefits can also benefit a surrounding a property or community.  <u>Id.</u>  Although there is a distinction between general and special benefits, <u>a jury decides</u> whether to consider a particular benefit when determining just compensation, and that conclusion is not determined by an expert's characterization of a benefit.  See <u>DNT, LLC v. Sprint Spectrum, LP</u>, No. 3:09-cv-21, 2010 WL 582164, at *3 (E.D. Va. Feb. 12, 2010) (holding that "factual disputes … are not appropriate subjects for a <u>Daubert</u> discussion").

And regardless of the distinction between general and special benefits, both Dove and Schmidt anchor their opinions in a critique of Landowners' experts and not in any separate valuation of special benefits.  A <u>Daubert</u> challenge is not intended to take this fact-intensive

18

question from the jury, especially—as in this case—when neither of the experts offer their testimony to support any finding of special benefits. See DNT, LLC, 2010 WL 582164, at *3. The United States' appraiser concedes that there are no "special benefits" to this project. See Colorito Parcel 126 Report, at 171 (ECF No. 97-6, at 8); Colorito Parcel 127 Report, at 98 (ECF No. 97-7, at 7). But his appraisal makes clear that he considered the improved vehicular access to the specific parcels in arriving at his valuation. See generally Colorito Parcel 126 Report (ECF No. 97-6); Colorito Parcel 127 Report (ECF No. 97-7). The United States' rebuttal experts Dove and Schmidt permissibly criticize Landowners' experts for failing to consider improvements that could result from the Project in the valuation of the subject property. Schmidt Report (ECF No. 97-1, at 4-9); Dove Parcel 126 Report (ECF No. 97-2, at 18-19); Dove Parcel 127 Report (ECF No. 97-3, at 11-12). Both opinions are meant to refute the Landowners' experts' value estimate, not offer their own value.[9] Landowners observe that during her deposition, Dove "stated that she was not engaged to render any opinions of value and has none" and that "she disclaimed offering any opinions of whether … the Project actually and specifically benefited the Landowner' properties." Landowners Mem. (ECF No. 97, at 12); Landowners Reply (ECF No. 99, at 10). But at this stage, the court need not analyze whether the Plaintiff has met its burden to prove special benefits because neither Dove nor Schmidt are being offered to prove special benefits, but rather rebut the opinions of Landowners' experts. See United States v. 1735 N. Lynn St., 676 F. Supp. 693, 699 (E.D. Va. 1987) (holding that the party offering evidence of special benefits has the burden of proof to establish particular value specific to the property).

---

[9] A jury determines which expert report is accurate and should be given more weight. See DNT, LLC, 2010 WL 582164, at *3.

Much of Landowners' arguments are premised on their characterization of both opinions as special benefits testimony. As such, Landowners argue that the United States has the burden of showing an increase in value for the remainder property at issue but fails to meet that burden since neither expert specifically opined on the properties' values before or after the taking." Landowners Reply (ECF No. 99, at 6-11). However, experts are allowed to opine on the characteristics of benefits. See Yellow Book § 4.6.3 (noting that "[t]he *extent* of a special and direct benefit is a fact question to be determined by the appraiser," but refraining from restricting expert testimony). More importantly, Dove and Schmidt do not offer any special benefits opinion or value to adjust just compensation. They simply identify the improvements which they believe the Landowners' experts failed to include in their reports and, in this way, rebut Ray's opinion on value. This is entirely permissible rebuttal testimony.

## C.   Schmidt's Expected Testimony Is Not Speculative and Does Not Lack Foundation

Since Schmidt's opinions are based on VDOT data and peer-reviewed studies, his expert testimony is not speculative in nature and does not lack a sufficient foundation. Relevant evidence is admissible at trial unless its probative value is substantially outweighed by a danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed R. Evid. 403. In an eminent domain proceeding, speculative evidence that does not impact the subject property's value is not relevant and is thus inadmissible. Olson v. United States, 292 U.S. 246, 257 (1934).

Landowners claim that Schmidt's traffic safety opinions are inadmissible because he did not provide any details about how or why the accidents were caused. Landowners Mem. (ECF No. 97, at 18-19); see also Landowners Reply (ECF No. 99, at 12). Additionally, they claim that his opinion does not "contain the data he relied upon" or information on "how much quicker, if

20

at all, vehicles could head westbound after the taking because he did not do a traffic count or any sort of a study." Landowners Mem. (ECF No. 97, at 23). By relying on studies he did not perform himself, Landowners argue that Schmidt's opinions lack sufficient foundation. Landowners Reply (ECF No. 99, at 13-14). As such, Landowners reason that "it is impossible for Mr. Schmidt to state with any reasonable certainty that the access to the subject properties is safer in the after-take condition than it is in the before take condition." Landowners Mem. (ECF No. 97, at 19). Additionally, Landowners argue that Schmidt's opinions "rest on an assumption of illegal actions by third-parties giving rise to these accidents, making the testimony irrelevant and speculative."[10] Id. at 20.

Schmidt's report, however, was based on VDOT statistics, peer-reviewed studies, and over 20 years of experience. Schmidt Report (ECF No. 97-1, at 7-12). In order to opine that removing the option to make an unsignalized left turn crossing multiple lanes of oncoming traffic will produce a safer intersection, Schmidt does not need knowledge of the characteristics of every crash that occurred at the intersection. See Brainchild Surgical Devices, LLC v. CPA Glob. Ltd., 144 F.4th 238, 254 (4th Cir. 2025) ("An expert "need not be precisely informed about all details of the issue."). Historical VDOT crash data from the intersection is proper evidence of the characteristics of the land at issue and may inform its value. See United States v. 1,014.16 Acres of Land, 558 F. Supp. 1238, 1242 (W.D. Mo.1983) ("An expert cannot be an expert in all fields, and it is reasonable to expect that experts will rely on the opinion of experts in other fields as background material for arriving at an opinion. Moreover, Rule 703 FRE explicitly allows an

---

[10] Landowners also cite to condemnation cases that hold that an expert's failure to connect a takings effect on a property's market value means the expert's opinion is speculative and irrelevant. ECF No. 98, at 20 (citing United States v. 50 Acres of Land, 49 U.S. 24, 29 (1984); Atlantic Coast Pipeline, LLC v. 0.07 Acres, 396 F. Supp. 3d at 642). However, as mentioned, the United States is not offering the testimony of Dove and Schmidt for a specific value of the land, but rather to rebut the opinions of Ray and Williams. For Schmidt specifically, this includes an analysis of safety and accidents near the subject property.

expert to base an opinion on facts or data made known to him at or before the hearing."). Landowners' critique of the data Schmidt relies upon goes to the weight of his testimony, not its relevance. See Brainchild Surgical Devices, LLC, 144 F.4th at 254. As such, Schmidt's expert opinion is neither speculative nor irrelevant.

## IV. CONCLUSION

For the foregoing reasons, the court DENIES Landowners' Motion in Limine to Exclude Testimony and Opinions of Plaintiffs' Experts Steve Schmidt and Nancy Dove. (ECF No. 96).

IT IS SO ORDERED.

_____/s/_____
Douglas E. Miller
United States Magistrate Judge

_____
DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
September 11, 2025