**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

**v.**

**0.1785 ACRES OF LAND, MORE OR**          **Civil Action No. 2:24-cv-23**
**LESS, SITUATE IN CHESAPEAKE**
**VIRGINIA, AND MSF INVESTORS II,**
**LLC, ET AL.,**

     **Defendants.**


## OPINION AND ORDER

This matter is before the court on Defendants MSF Investors II, LLC and Arcadia Equity Associates' ("Landowners") Motion in Limine to Exclude Certain Testimony of Lawrence J. Colorito, Jr., (ECF No. 104), the United States' Motion to Exclude Matthew Ray's Testimony about Parcel 127, (ECF No. 106), and a portion of the United States' Motion in Limine to Exclude Certain Evidence from Trial, (ECF No. 108),[1] regarding testimony and evidence about negotiation and development costs related to the property at issue. On July 1, 2026, the court heard oral arguments by counsel via Zoom. For the reasons explained below, the court GRANTS IN PART the United States' Motion to Exclude Ray's Testimony, (ECF No. 106), GRANTS the remaining unresolved portion of the United States' Motion in Limine, (ECF No. 108), and GRANTS IN PART and DENIES IN PART Landowners' Motion to Exclude Colorito's Testimony, (ECF No. 104).

---

[1] After ruling from the bench for the other portions of the Motion in Limine to Exclude Certain Evidence from Trial, (ECF No. 108), the court summarized its ruling in an earlier Order. (ECF No. 149). Resolving the remaining portion present before the court was deferred to this Opinion and Order due to significant overlap with the other two pending motions.

## I.    BACKGROUND

In this condemnation case, the sole issue for trial is the amount of just compensation owed to Landowners for the United States' taking.  During a construction project replacing the Deep Creek Bridge to improve access to nearby roadways in the City of Chesapeake, Virginia ("Project"), the United States condemned Landowners' interests in 0.1785 acres of land on January 22, 2024.  The government's taking impacts two parcels of land—an existing shopping center ("Parcel 126") and a separately platted outparcel that was physically vacant on the date of taking but was under contract to develop a Starbucks ("Parcel 127").  Although the amount of land taken is not in controversy, Landowners and the United States each disagree about the other party's expert appraiser's methodology to determine the value of the land and thus the just compensation owed.  The court previously discussed the factual background of the case at length in an earlier Opinion and Order.  See (ECF No. 102).  Rather than repeat the background, the court summarizes information relevant to the three motions presently at issue.

### A.    Appraisal Methodologies

When exercising its power of eminent domain under the Fifth Amendment of the Constitution, the United States is required to pay "just compensation" when it condemns private property for public use.  U.S. Const. amend. V.  Just compensation is determined by the difference in property value before and after a taking, accounting for any specific damage or benefit to the property.  See United States v. Petty Motor Co., 327 U.S. 372, 377 (1946).  The relevant property value is the "fair market value," which is determined by "the highest and best use" of the property.  Olson v. United States, 292 U.S. 246, 255 (1934).  The highest and best use—"the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future"—is determined by considering what is (1) physically possible; (2) legally

2

permissible; (3) financially feasible; and (4) most profitable.  Id.; The Interagency Land Acquisition Conference, Uniform Appraisal Standards for Federal Land Acquisitions §§ 4.3.1-.3.2 [hereinafter Yellow Book].[2]  When the United States engages in a partial taking—condemns only part of a larger parcel of land—the before and after method is considered the conventional method for determining just compensation.  Yellow Book §§ 4.6-4.6.1; Olson, 292 U.S. at 255; see also United States v. Va. Elec. & Power Co., 365 U.S. 624, 632 (1961) (describing the before and after method as "an acceptable method of appraisal").  Under this method, the value of the partial taking is the value of the land remaining after the taking subtracted from the value of the larger parcel of land before the taking.  See, e.g., Va. Elec. & Power Co., 365 U.S. at 632; United States v. 8.41 Acres of Land, More or Less, Situated in Orange Cnty., State of Tex., 680 F.2d 388, 392 (5th Cir. 1982).  To put another way, the difference between the before and after values of the property at its highest and best use is the amount of just compensation owed to the Landowners under the Fifth Amendment.

For an appraisal of property, there are three standard methods of valuation: (1) the Sales Comparison Approach, (2) the Cost Approach, and (3) the Income Approach.  Priv. Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc., 296 F.3d 308, 310 (4th Cir. 2002); Yellow Book § 4.4.1. To understand the expert appraisals in this case and the parties' arguments, a brief explanation of each method is helpful.

Under the Sales Comparison Approach—the preferred methodology for determining market value in federal acquisitions—the estimated value of the appraised property is based on

_____

[2] A copy of the Yellow Book can be found online.  Uniform Appraisal Standards for Federal Land Acquisitions (2016), https://www.justice.gov/d9/enrd/legacy/2015/04/13/uniform-appraisal-standards.pdf [https://perma.cc/4HJM-FH2A]. "We refer to the Yellow Book throughout our analysis because its 'federal Standards, frequently cited in legislation and court rulings, have guided the appraisal process in the valuation of real estate in federal acquisitions since their original publication ... in 1971.'" United States v. 8.929 Acres of Land in Arlington Cnty., Va, 36 F.4th 240, 247 (4th Cir. 2022) (citing John C. Cruden, *Foreword to* Yellow Book, at 1)

3

sales of comparable property. Yellow Book § 4.4.2; see, e.g., United States v. Whitehurst, 337 F.2d 765, 775 (4th Cir. 1964); United States v. 320.0 Acres of Land, 605 F.2d 762, 798 (5th Cir. 1979). "[T]he more similar the land is[,] the more probative the sale price is." United States v. 269 Acres, More or Less, Located in Beaufort Cnty. S.C., 995 F.3d 152, 164 (4th Cir. 2021). Generally, "comparability is a function of three variables: the respective characteristics of the properties, their geographic proximity to each other, and their closeness in time of sales." Id. (quoting United States v. 68.94 Acres of Land, 918 F.2d 389, 399 (3d Cir. 1990)); 320.0 Acres of Land, 605 F.2d at 798; see also United States v. Eastman, 528 F. Supp. 1184, 1186 (D. Or. 1981) (noting that comparable sale values are adjusted "up or down" to account for differences in each comparable sale factor such as "time of sale, size of parcel, location, topography, and other such variables"). Once prices of comparable sales are adjusted for differences, they are then "reconciled to a final opinion of market value" for the subject property. Yellow Book § 1.5.2. "Because identifying the relevant comparisons and making value adjustments often turns into a battle of experts," district courts make determinations regarding challenges to those expert opinions. 269 Acres, 995 F.3d at 164.

Under the Cost Approach, the approach most relevant to the present expert motions, performing an appraisal is defined as:

> A set of procedures through which a value indication is derived for the fee simple interest in a property by estimating the current cost to construct a reproduction of (or replacement for) the existing structure, including an entrepreneurial incentive,[3] deducting depreciation from the total cost, and adding the estimated land value. Adjustments may then be made to the indicated fee simple value of the subject property to reflect the value of the property interest being appraised.

---

[3] Entrepreneurial incentive is "the amount an entrepreneur expects or wants to receive as compensation for providing coordination and expertise and assuming the risks associated with the development of a project." United States v. 15,478 Square Feet of Land (Balaji Sai), No. 2:10-cv-322, 2011 WL 2471586, at *6 (E.D. Va. 2011)

4

United States v. 15,478 Square Feet of Land (Balaji Sai), No. 2:10-cv-322, 2011 WL 2471586, at *5 (E.D. Va. 2011) (quoting Dictionary of Real Estate Appraisal 47 (5th ed. 2010)); see also Yellow Book § 4.4.3 ("In this approach, the reproduction or replacement cost of the improvements, less appropriate depreciation, is added to the estimated market value of the land as if vacant to derive an indication of the market value of the property as a whole."). Essentially, "[t]he cost approach requires that land and improvements must be valued separately," and it "is designed to value properties with physical improvements." Balaji Sai, 2011 WL 2471586, at *5. As such, using the cost approach to value vacant land is "unwarranted." Id. Instead of being used as a "stand-alone indication of value for federal acquisitions," the Cost Approach "is typically employed either to test the financial feasibility of a potential highest and best use or to 'check' or test the reasonableness of estimates of value indicated by other approaches." Yellow Book § 4.4.3.

The Income Approach—relevant only in circumstances where there is income-producing property with no available comparable sales and thus ill-suited to determine just compensation—look's at a property's potential to generate income to determine its present market value. Id. § 4.4.4; see also Mountain Valley Pipeline, LLC v. 8.37 Acres of Land by Terry, 101 F.4th 350, 354 (4th Cir. 2024); United States v. Whitehurst, 337 F.2d 765, 775 (4th Cir. 1964).

## B.    The Parties' Experts

Both parties' appraisers agree that the highest and best use of Parcel 127 is commercial property development. However, they disagree about their method of appraising the outparcel to consider the existing lease with Starbucks and the value it adds to the raw land. Before selecting an appraisal methodology to value property, an appraiser must determine if the estate to be valued is a fee simple estate—"[a]bsolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police

power, and escheat"—or a leased fee estate—"ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires." Dictionary of Real Estate Appraisal 73, 105 (7th ed. 2022) (ECF No. 144-4, at 8). "[I]n an acquisition of property in fee simple absolute," as is the case here, "the property must be appraised as an undivided fee." Yellow Book § 4.2.2.1. The parties agree that an undivided fee appraisal is appropriate in this case.

### 1.    Matthew Ray's Expert Report

Landowners' appraiser Matthew Ray valued the portion of land taken from Parcel 127[4] by calculating the market value difference of the subject property before and after the taking. In describing the Parcel 127 taking, Ray notes that the fee area acquired involved 0.0049 acres of land, with a permanent drainage easement for 0.0267 acres of land and a temporary work easement for 0.0424 acres of land. Mem. Supp. United States' Mot. to Exclude Matthew Ray's Test. Ex. 1 ("Ray Report") at 3, 69 (ECF No. 107-1, at 4, 27). However, he does not explicitly include any specific value adjustments related to these easements. Using the before and after method, Ray concluded that the fair market value (and thus the just compensation owed to Landowners) for Parcel 127 is $300,000—valuing the property before the taking at $1,300,000 and after the taking at $1,000,000. Id. at 3, 69 (ECF No. 107-1, at 4, 27). Before this valuation, Ray concluded the highest and best use of Parcel 127 was development with commercial use, or in this case, development of a Starbucks given the already executed build-to-suit lease with Starbucks. Id. at 3, 39, 66 (ECF No. 107-1, at 4, 11, 24). Informing his highest and best use determination, Ray considered the financial feasibility of building a Starbucks on Parcl 127 before and after the taking by calculating Landowners' entrepreneurial incentive from development. Id. at 37-39, 65-66 (ECF

---

[4] Matthew Ray appraised both Parcel 126 and Parcel 127 but at issue here is the valuation of the Starbucks outparcel, Parcel 127.

No. 107-1, at 9-11, 23-24). In doing so, he assumed Starbucks was already built on vacant land, operating, and paying rent at the time of the taking, and added those values. Id. After using the Income Approach to estimate the value of Parcel 127 before and after the taking, Ray subtracted reported construction costs and referred to that difference as the entrepreneurial incentive. Id. Afterward, Ray divided the entrepreneurial incentive amounts by construction costs to produce entrepreneurial incentive percentages[5] that he used for his valuation analysis. Id.

Ray's before and after valuations, therefore, are the sum of the value of the raw land, development costs, and "enhancements for development progress" (Ray's term for entrepreneurial incentive)[6]—the latter two being elements of the Cost Approach. Id. at 50, 68 (ECF No. 107-1, at 22, 26). Ray's Report disclaims reliance on the Cost Approach, noting that "while the property was in the development process, physical construction had not begun," and as such, "the Cost Approach [was] omitted. However, elements of the Cost Approach [were] considered when valuing the steps taken in the development process as of the date of taking." Id. at 8 (ECF No. 107-1, at 6). Ray reiterates that he "use[d] the Sales Comparison Approach," but "[e]lements of the Cost Approach [were] used to account for owner's investment in the property and its development progress." Id. at 9 (ECF No. 107-1, at 7). Because Ray believed "it would be improper to ignore the time, effort, costs, and risks taken to secure a lease on the property…and begin the development process," he considered these factors as "an enhancement to [the property's] value" instead of valuing the property as vacant land. Id. at 8-9 (ECF No. 107-1, at 6-7).

---

[5] Ray concluded the percentage was 66.77% before take and 41.96% after take. Id.

[6] Ray's Report explains that "as the date of taking, it is estimated that the property has achieved not less than 40% to 50% of the entrepreneurial incentive," and then he uses 40% as the "enhancement for development progress" in his before valuation. Id. at 50 (ECF No. 107-1, at 22). As such, Ray is representing the "entrepreneurial incentive" value as the "enhancement for development progress" value.

For his before valuation, Ray used the Sales Comparison Approach, found three vacant land sales, and adjusted those prices for differences in the property. Id. at 40-48 (ECF No. 107-1, at 12-20). To the land value, Ray added "construction-related development costs" from before the take. Id. at 50 (ECF No. 107-1, at 22). Then, Ray calculated entrepreneurial incentive to be 40% of the land value and development costs. Id. Adding the land value, the development costs, and the entrepreneurial incentive, Ray concluded the before take value of Parcel 127 is $1,300,000. Id. For his after valuation, Ray added the same three values but he made the following changes to reflect the impact of the taking on Parcel 127: (1) he made a uniform 25% downward adjustment to land value after reducing the financial feasibility of the property for the highest and best use analysis post-take; and (2) he reduced the entrepreneurial incentive from 40% to 30% to reflect the uncertainty that came with a partial taking. Id. at 67-68 (ECF No. 107-1, at 25-26). With the lower land value and entrepreneurial incentive, Ray's valuation for Parcel 127 after the take dropped to $1,000,000. Id. After calculating the difference between the before and after take values, Ray concluded that the fair market value and thus the just compensation owed to Landowners for Parcel 127 is $300,000. Id. at 3, 69 (ECF No. 107-1, at 4, 27).

1.    **Lawrence J. Colorito, Jr.'s Expert Report**

Lawrence J. Colorito, Jr., the United States' expert appraiser, provided two appraisals for each of the parcels—Parcel 126 and Parcel 127—condemned by the United States. The United States' assignment instructions for Colorito included the following two premises for the appraisals for each parcel of land:

> **Premise 1:** In the before condition, appraise the Subject Property in undivided fee simple, subject to existing easements and improvements for roads, utilities, and rights of way belonging to the City of Chesapeake, Virginia, and any other existing easements for public roads, highways, utilities, and rights-of-way, but under the hypothetical condition that the existing leases do not exist.

8

In the after condition, appraise the Subject Property in undivided fee simple, in its physical condition as it existed on the effective date of value, giving consideration to the project and its anticipated effect on the value of the Subject Property, subject to existing easements and improvements for roads, utilities, and rights of way belonging to the City of Chesapeake, Virginia, and any other existing easements for public roads, highways, utilities, and rights-of- way, and subject to the property interests condemned in this case.

**Premise 2:** In the before condition, appraise the interest of MSF Investments II, LLC, and Arcadia Equity Associates, subject to the leases in place on the effective date of value (i.e., the Leased Fee), and subject to existing easements and improvements for roads, utilities, and rights of way belonging to the City of Chesapeake, Virginia, and any other existing easements for public roads, highways, utilities, and rights-of-way.

In the after condition, appraise the Leased Fee interest of MSF Investments II, LLC, and Arcadia Equity Associates, subject to existing easements and improvements for roads, utilities, and rights of way belonging to the City of Chesapeake, Virginia, and any other existing easements for public roads, highways, utilities, and rights-of-way, and also subject to the property interests condemned in this case.

United States Appraisal Assignment Instructions (ECF No. 105-1). In short, Premise 1 instructs Colorito to perform an undivided fee simple interest appraisal, whereas Premise 2 instructs him to perform a leased fee appraisal. Relevant here are both appraisals for Parcel 127.

In his fee simple appraisal, Colorito concluded the taking from Parcel 127 is worth $20,000. United States' Opp'n to Defs.' Mot. to Exclude Test. Lawrence J. Colorito Ex. 4 ("Colorito Fee Simple Report") at 10 (ECF No. 144-2, at 11). Colorito used the Sales Comparison Approach, and after determining that development of the Starbucks would be the highest and best use of the property, he found comparable sales of vacant property that was purchased for development where the improvements were not yet constructed. Id. at 9, 63-88 (ECF No. 144-2, at 10, 15-38). He adjusted the sale value for costs already incurred, but he did not value the property as improved with income generated on the date of taking. In doing so, Colorito estimated the before take value of Parcel 127 at $390,000. Id. at 10 (ECF No. 144-2, at 11). After the taking, Colorito used comparable ground leases to determine that the taking reduced Parcel 127's value to $370,000,

9

making the value of the taking $20,000. Id. at 10, 80-88 (ECF No. 144-2, at 11, 30-38). Colorito notes that the fee area (215 square feet) and the drainage ditch easement (1,163 square feet) acquisitions do not have an adverse impact on value because they do not impact the "proposed improvements, use, or functional utility of the subject property." Id. at 36 (ECF No. 144-2, at 13). However, the temporary work area easement for a 1,846 square foot area of land will be disruptive and have an impact on the subject property. Id. To account for this easement, Colorito included a "property rights line-item adjustment" in his valuation of the site that he opined was equal to the value of the take. Id. at 36, 85-88 (ECF No. 114-2, at 13, 35-38).

In his leased fee appraisal, Colorito considered the lease with Starbucks and valued the taking by determining the value as if the Starbucks was built and paying rent under the lease and then deducting the remaining construction and lease costs to reflect the fact that no improvements had yet been constructed. United States' Opp'n to Defs.' Mot. to Exclude Test. Lawrence J. Colorito Ex. 3 ("Colorito Leased Fee Report") at 80-85, 91-105, 118-126 (ECF No. 105-3, at 13-41). He again made a "line adjustment to account for the real property rights conveyed as they correlate to the five-year temporary work area easement." Id. at 118-26 (ECF No. 144-3, at 34-41). Under this appraisal, he valued Parcel 127 at $1,000,000 before the take and at $980,000 after the take, making the taking value and thus the just compensation owed to Landowners $20,000 as well. Id. at 105, 126 (ECF No. 105-3, at 33, 41).

**B.      Current Motion**

In the United States' Motion to Exclude Matthew Ray's Testimony, (ECF No. 106), the Government argues Ray improperly used the Cost Approach appraisal methodology—an "approach [ ] designed to value properties with physical improvements"—to value the Parcel 127 taking even though it was vacant on the date of taking, January 22, 2024. Mem. Supp. United

States' Mot. to Exclude Matthew Ray's Test. ("Pl.'s Mem.") (ECF No. 107, at 1-2) (quoting Balaji Sai, No. 2:10-cv-322, 2011 WL 2471586, at *5 (E.D. Va. 2011)). In a separate but overlapping motion, the United States moved to exclude testimony and evidence about the costs of negotiating the Starbucks lease and developing Parcel 127.[7] United States' Mot. in Limine to Exclude Certain Evid. ("Costs Mot.") (ECF No. 108). The Government argues that "[c]osts for negotiating a business deal—like the Starbucks lease—and development costs on vacant property are not compensable in condemnation actions." Mem. Supp. Costs Mot. ("Pl.'s Costs Mem.") (ECF No. 109, at 7, 12-13). This includes the development costs reflected in Ray's Report valuing Parcel 127, which overlaps with the Motion to Exclude Matthew Ray's Testimony, (ECF No. 106). It also includes separately proferred testimony from Lat Pursuer, the Managing Partner and Authorized Agent for Arcadia Equity Associates, regarding those development and negotiation costs. Pl.'s Costs Mem. (ECF No. 109, at 13).

Landowners oppose both motions. First, Landowners maintain that Ray used the Sales Comparison Approach, not the Cost Approach. Defs.' Mem. Opp'n to United States' Mot. to Exclude Matthew Ray's Test. ("Defs.' Opp'n") (ECF No. 142, at 3, 9, 11) (citing Ray Report at 8 (ECF No. 107-1, at 6)). Moreover, Landowners argue that Parcel 127, although physically undeveloped, was not vacant on the day of taking because it was under lease to Starbucks and therefore had more value than "raw" land and thus should be valued in a manner that accounts for those developments. Id. at 9. Additionally, Landowners argue that the Government's main contention with Ray's Report is the higher market value determination, not his methodology, which ultimately makes the issue a factual matter for the jury to consider and weigh. Id. at 22-23. Although Landowners agree to stipulate that Ray and Purser will not testify that the costs of

---

[7] Ruling on this portion of the Motion in Limine to Exclude Certain Evidence from Trial regarding negotiation and development costs was initially deferred during the hearing held on July 1, 2026. Order (ECF No. 149, at 2).

negotiating the Starbucks lease and preparing and revising development plans are a measure of just compensation, they argue that testimony on these topics should be permitted as an explanation of the material informing Ray's ultimate valuation of the subject property before and after the take. Defs.' Mem. Opp'n to United States' Mot. in Limine to Exclude Certain Evid. ("Defs.' Costs Opp'n") (ECF No. 141, at 14).

The United States reply that Ray's property valuation for Parcel 127 contains all three elements of the Cost Approach—(1) land value, (2) costs incurred to date, and (3) entrepreneurial incentive. Two of these, the Government argues, are improper elements of value because Parcel 127 was vacant, without any physical developments on the date of take. Reply Supp. Mot. to Exclude Matthew Ray's Test. ("Pl.'s Reply") (ECF No. 145, at 3). Because business losses and development costs incurred before condemnation cannot be considered when awarding just compensation, the United States' Reply regarding Ray and Purser's testimony argues that any testimony on this topic would confuse or mislead the jury. Reply Supp. United States' Mot. in Limine ("Pl.'s Costs Reply") (ECF No. 146, at 7-8).

A related and overlapping filing, Landowners' Motion in Limine to Exclude Certain Testimony of Lawrence J. Colorito, Jr., (ECF No. 104), seeks to exclude: (1) Colorito's "leased fee" appraisals for failure to comply with applicable law; (2) Colorito's undivided fee simple appraisal for not accounting for the lease and building approvals in place and thus failing to accurately determine market value of the property; and (3) unreliable evidence in Colorito's appraisal that fail to state the hypothetical conditions relied upon when making a valuation determination. Defs.' Mem. Supp. Mot. to Exclude Test. Lawrence J. Colorito, Jr. ("Defs.' Mem.") (ECF No. 105, at 3-4). The United States conditionally opposed the Motion. United States' Opp'n to Defs.' Mot. to Exclude Test. Lawrence J. Colorito, Jr. ("Pl.'s Opp'n") (ECF No.

144). First, the Government agreed not to offer Colorito's leased fee appraisals if the Cost Approach elements of Ray's appraisal are excluded because it will be irrelevant. Id. at 2-3, 18. Second, the United States argues that lease approvals and development costs are not standalone values that should be added to the valuation of the subject property because Parcel 127 was vacant on the date of take and its proper appraisal under the Sales Comparison Approach already accounts for any value those two considerations add. Id. at 3, 10-14. Finally, the United States contends that Landowners fail to articulate what hypothetical conditions were improperly undisclosed and thus lack support for any exclusion based on improper disclosure. Id. at 3, 22-23. Landowners reply, arguing that the Government's opposition failed to cure the defects in Colorito's report. Defs.' Reply Mem. Supp. Mot. to Exclude Test. ("Defs.' Reply") (ECF No. 147, at 2).

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 71.1, "except for the single issue of just compensation, the trial judge is to decide all issues, legal and factual, that may be presented" in federal eminent domain proceedings. United States v. Reynolds, 397 U.S. 14, 19 (1970). Rule 71.1(h) "discloses a clear intent to give the district judge a role in condemnation proceedings much broader than he occupies in a conventional jury trial." Id. at 20. Thus, it is for the trial judge to "decide 'all issues' other than the precise issue of the amount of compensation to be awarded," including preliminary matters such as motions in limine regarding expert witnesses. Id.; see also United States v. 8.929 Acres of Land in Arlington Cnty., Va, 36 F.4th 240, 251 (4th Cir. 2022).

The purpose of a motion in limine is "to allow a court to rule on evidentiary issues in advance of trial in order to avoid delay, ensure an even-handed and expeditious trial, and focus the issues the jury will consider." United States v. Verges, No. 1:13-cr-222, 2014 WL 559573, at *3 (E.D. Va. Feb. 12, 2014). "Questions of trial management are quintessentially the province of the

13

district courts," United States v. Smith, 452 F.3d 323, 332 (4th Cir. 2006), and thus, the court has broad discretion when considering a motion in limine. See Kauffman v. Park Place Hosp. Grp, 486 F. App'x 220, 222 (4th Cir. 2012). A motion in limine to exclude evidence "should be granted only when the evidence is clearly inadmissible on all potential grounds." Verges, 2014 WL 559573, at *3. Relevant evidence is admissible at trial unless its probative value is substantially outweighed by a danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed R. Evid. 403. In an eminent domain proceeding, speculative evidence that does not impact the subject property's value is not relevant and is thus inadmissible. Olson v. United States, 292 U.S. 246, 257 (1934) ("Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable should be excluded from consideration for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value.").

In determining the admissibility of expert witness testimony, Rule 702 of the Federal Rules of Evidence governs. United States v. Wilson, 484 F.3d 267, 274-75 (4th Cir. 2007). Under the Rule:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

14

Fed. R. Evid. 702. In other words, expert testimony is admissible under Rule 702 "if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the jury or other trier of fact to understand or resolve a fact at issue." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 260 (4th Cir. 1999) (citing Daubert v. Merrell Dow Pharm., 509 U.S. 579, 592 (1993)).

The first prong requires the court to examine "whether the reasoning or methodology underlying the expert's proffered opinion is reliable" and the second prong asks the court to analyze "whether the opinion is relevant to the facts at issue." Id.; see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999) ("[T]he Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" (quoting Daubert, 509 U.S. at 597)); Oglesby v. General Motors Corp., 190 F.3d 244, 249-50 (4th Cir. 1999) ("[A] district judge, considering a proffer of expert testimony under Federal Rule of Evidence 702—whether based on scientific, technical, or other knowledge—must, in determining its admissibility, ensure that the evidence is 'not only relevant, but reliable'" (quoting Daubert, 509 U.S. at 589)). That is, "a reliable expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." Oglesby, 190 F.3d at 250 (citing Daubert, 509 U.S. at 590, 592-93). "The proponent of the testimony must establish its admissibility by a preponderance of proof." Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001) (citing Daubert, 509 U.S. at 592 n.10).

Thus, the District Court serves as a gatekeeper to assess whether the proffered evidence is reliable and relevant. Kumho Tire Co., 526 U.S. at 141. But the gatekeeper function does not require that the Court "determine that the proffered expert testimony is irrefutable or certainly correct" because expert testimony is "subject to testing by 'vigorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof.'" United States v. Moreland, 437 F.3d 424, 431 (4th Cir. 2006) (quoting Daubert, 509 U.S. at 596). There is no "mechanistic test for determining the reliability of an expert's proffered testimony; on the contrary, 'the test of reliability is flexible and the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.'" Peters-Martin v. Navistar Int. Trans. Corp., 410 F. App'x 612, 617 (4th Cir. 2011) (quoting United States v. Wilson, 484 F.3d 267, 274 (4th Cir. 2007)) (internal citations and quotations omitted).

The text of Rule 702 explicitly contemplates experiential experts. Fed. R. Evid. 702 (listing "experience" as an expert qualification"); see also Fed. R. Evid. 702 advisory committee's note ("Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony."). "Purely scientific testimony . . . is characterized by 'its falsifiability, or refutability, or testability.'" Wilson, 484 F.3d at 274 (quoting Daubert, 509 U.S. at 593). But experiential expert testimony does not "rely on anything like a scientific method," causing the district court's role in "examining the reliability of experiential expert testimony" to become "somewhat more opaque." Id. (citing Fed. R. Evid. 702 advisory committee's note). Nevertheless, the court's gatekeeping role "is to 'make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Cooper, 259 F.3d at 200 (citing Kumho Tire, Co., 526 U.S. at 152). Therefore, courts must still require an experiential expert to "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his]

16

experience is reliably applied to the facts." Wilson, 484 F.3d at 274 (quoting Fed. R. Evid. 702 advisory committee's note) (alterations in original).

### III.    ANALYSIS

The three pending motions before the court significantly overlap and the parties disagree on information considered as part of the other party's expert appraiser's methodology used to value Parcel 127. After reviewing the standard appraisal methodologies and all the expert reports, I find that Landowners' appraiser, Matthew Ray, improperly considered and included value from development costs and progress when appraising Parcel 127. Thus, his testimony and portions of his report impermissibly referencing elements of the Cost Approach should be excluded alongside testimony from Landowners' other witnesses regarding incurred costs and development. As a result, the portion of Landowners' motion to exclude Colorito's lease fee appraisal is mooted, and any remaining arguments regarding his fee simple appraisal are proven incorrect.

### A.    Ray's Appraisal of Parcel 127 Improperly Uses Elements of the Cost Approach to Value the Land and Thus Those Elements Should Be Excluded.

When appraising property that is vacant, it is improper to consider development costs and entrepreneurial incentives. Balaji Sai, No. 2:10-cv-322, 2011 WL 2471586, at *3, 5 (E.D. Va. 2011). These elements of the Cost Approach to appraising land only apply when there are physical improvements to the subject property. Id. This court rejected use of the Cost Approach, including consideration of both development costs[8] and entrepreneurial incentive, in Balaji Sai because the land was vacant without any physical improvements on the date of the take. Id. at *1, 3, 5. The only portion of the landowners' expert appraisal in that case that was not excluded was the value of the vacant land determined through the Sales Comparison Approach. Id. at *5-6.

---

[8] Development costs include, for example, demolishing buildings, entering a franchise agreement, and obtaining necessary local permits and approvals. Id. at *1-2.

17

In this case, Parcel 127 was vacant when the United States condemned the land. As such, it is "unwarranted" to use elements of the Cost Approach to value Parcel 127 at the relevant time. Id. at *5. Landowners steadfastly maintain that Ray used a Sales Comparison Approach rather than a Cost Approach as specifically noted in his report. Defs.' Opp'n (ECF No. 142, at 3, 9, 11) (citing Ray Report at 8 (ECF No. 107-1, at 6) ("As such, the Cost Approach is omitted.")). But Ray's Report explicitly recognized that "elements of the Cost Approach [were] considered when valuing the steps taken in the development process as of the date of taking." Ray Report at 8 (ECF No. 107-1, at 6). Similar to the expert appraiser in Balaji Sai, Ray improperly considered elements of the Cost Approach in both his before and after valuations of Parcel 127. Thus, testimony and evidence related to the approximately $300,000 Ray attributed to construction-related development costs, and both the $371,460 and $230,590 he attributes to entrepreneurial incentives in the before and after valuations of Parcel 127, respectively, should be excluded. See id. at 8, 50, 68 (ECF No. 107-1, at 6, 22, 68). Additionally, separate from the overall valuation of Parcel 127, Ray factors entrepreneurial incentive by making a 25% downward adjustment to comparable sales when using the Sales Comparison Approach to determine land value. Id. at 67 (ECF No. 107-1, at 25). Landowners claim Ray had to value land in this way because there were "no sales of similarly positioned properties," despite his robust attempt to find comparable sales, given that the take occurred when there was a long-term lease and development approvals in place, but no buildings constructed. Defs.' Opp'n (ECF No. 142, at 11) (citing Ray Report at 8, 49 (ECF No. 107-1, at 6, 21)).[9] But by identifying entrepreneurial incentive as a separate factor and then

---

[9] "The appraiser interviewed market participants regarding their knowledge and experience with of [sic] sales with a similar lease and development status as the property as of the date of taking and investigated the market for sales of properties which were leased on similar terms and occurred at a similar point in its development. ... the market participants were unaware of any such transaction where a property was leased and the rental payment was contingent upon the development of the property but where the construction of the improvements had not been completed. Further, the market participants confirmed that such a sale would be rare and unlikely to occur in the normal course of real estate investing and development." Ray Report at 8 (ECF No. 107-1, at 6).

reducing the land value of comparable sales due to a claimed adjustment to account for entrepreneurial incentive, Ray effectively double counts the impact of entrepreneurial incentive.[10] Moreover, as explained, entrepreneurial incentive is part of the Cost Approach and is only applicable to property with physical improvements, not vacant property. See Balaji Sai, 2011 WL 2471586, at *5-6. Any value added (or lost) to the land, "inherent in the property's potential for development," is already adequately captured by the Sales Comparison Approach. Balaji Sai, 2011 WL 2471586, at *5-6, 11 ("[V]alue contributed by several of the costs Defendant's appraisers took into account was already captured by analysis of comparable sales, and therefore allowing evidence of value above the land value risks 'double counting' that value."). Landowners point to alleged agreement by the Government's expert that the existing lease and development approvals have value. Defs.' Opp'n (ECF No. 142, at 22) (citing Colorito Fee Simple Report at 73 (ECF No. 144-2, at 25)). But any value they have is not appropriately attached to the land by way of development costs or entrepreneurial incentive. Other business losses that may have resulted to the Landowners from the taking "are not compensable under the Fifth Amendment." Id. at *4. Thus, Ray may not testify about development costs and entrepreneurial incentive—or as he calls it, enhancement for development progress—because both these factors from the Cost Approach appraisal methodology are inapplicable to vacant land and render those portions of Ray's opinion unreliable.

Landowners argue that the "consideration of entrepreneurial incentive comports with current law." Defs.' Opp'n (ECF No. 142, at 11-12) (quoting United States v. 1.604 Acres of Land, More or Less, Situate in City of Norfolk, Va. (Granby I), 844 F. Supp. 2d 668, 683 (E.D.

---

[10] The United States correctly notes that Ray's testimony has been excluded for "double dipp[ing]" and reducing the value of condemned property in the past. See, e.g., Sabal Trail Transmission, LLC v. 3.921 Acres of Land in Lake Cnty., No. 5:16-cv-178, 2017 WL 9939115, at *10 (M.D. Fla. Oct. 23, 2017).

19

Va. 2011)). They argue Ray used entrepreneurial incentive in his analysis of financial feasibility to develop the property and determine the highest and best use, not the valuation of the property. Id. at 12-13, 15. But as explained above, considering entrepreneurial incentive[11] does not apply to vacant land and the subject property must be at least partially improved to consider it. The case Landowners cite, Granby I, involved a partially improved parcel and discussed entrepreneurial incentive in the context of the Cost Approach—that is inapplicable to the vacant land in this case. See 844 F. Supp. 2d at 683. Ray's justification to do so—considering the value from the lease and development approvals—is already accounted for in the valuation of the land using the Sales Comparison Approach and does not need to be considered again as Ray's appraisal purports to do. See Balaji Sai, 2011 WL 2471586, at *5-6, 11. Even if Ray used the factors of the Cost Approach in determining financial feasibility, he did not stop there but rather also used the information in the appraisal's valuation sections. Ray Report at 50, 68 (ECF No. 107-1, at 22, 26).

At bottom, Landowners insist that on the day of taking, Parcel 127, although physically undeveloped, was not vacant because it was under lease to Starbucks and because Landowners had all the required development and construction approvals to begin physical construction. Defs.' Opp'n (ECF No. 142, at 1-2, 9). As such, they maintain that reliance on the Cost Approach, or elements of it, especially to evaluate the highest and best use as Ray does in his Report, is acceptable and proper. Id. at 18-19. However, like in Balaji Sai which also involved a franchise agreement and development steps, an appraiser is still required to use the Sales Comparison Approach because the land is considered vacant for appraisal purposes when it is physically

---

[11] The Government also argues that Ray incorrectly calculates the entrepreneurial incentive value itself by calculating it as a percentage of costs incurred to date and land value, and that he fails to support his figures, which are above the typical entrepreneurial incentive ranges, with market data. Pl.'s Mem. (ECF No. 107, at 16-17) (citations omitted). Because the court finds that Ray may not testify about entrepreneurial incentive (along with development costs) to enhance the value of Parcel 127, the court need not analyze the accuracy of Ray's enhancement for development progress, or entrepreneurial incentive, figures.

20

undeveloped. Balaji Sai, 2011 WL 2471586, at *3, 5. Thus, Ray may not support his opinion of value using elements of the Cost Approach as he purports to.

Landowners attempt to distinguish Balaji Sai for the following reasons: (1) unlike Ray, the expert appraiser in that case actually performed a Cost Approach analysis; (2) just compensation calculations in that case included reimbursements for intangible development costs unlike Ray's valuation; (3) the hotel franchise agreement in that case was not transferable and could not be sold on the open market, unlike like the build-to-lease agreement with Starbucks; (4) that case had actual land comparables for the subject property, unlike Parcel 127, where the sale price could have been adjusted to account for development conditions of the property; and (5) the direct recovery costs sought in that case only had a speculative contribution to the property's value unlike this case. Defs.' Opp'n (ECF No. 142, at 19) (citing Balaji Sai, 2011 WL 2471586 (E.D. Va. June 20, 2011)). However, as the United States notes, of these enumerated differences, only one is real[12]—the personal nature of the hotel franchise agreement in Balaji Sai. That is different than the Starbucks lease for Parcel 127, which is transferable. But even with that difference, the United States is only required to pay for what it condemned, and the landowners are not entitled to business losses in a condemnation. United States ex rel. TVA v. Powelson, 319 U.S. 266 (1943); Balaji Sai, 2011 WL 2471586, at *4 (E.D. Va. June 20, 2011). In this case, the United States did not condemn the Starbucks lease, and thus it cannot be valued as a standalone item and can only be used to inform the potential use of Parcel 127—and its value using the Comparable Sales Approach.

---

[12] Addressing the other alleged differences: (1) Ray did use elements of the Cost Approach by considering all three components of the approach for his appraisal; (2) Ray also valued intangibles, despite Balaji Sai's prohibition, like the "negotiation of the lease;" (3) Ray selected comparable sale properties that were purchased for anticipated development imposing adjustments as necessary; and (4) Ray's inability to recall items that incurred costs rendered those costs speculative.

21

**B.    Testimony About Development and Negotiation Costs Should Be Excluded.**

Landowners agreed to stipulate that Ray and Purser would not testify about the costs of negotiating the Starbucks lease and preparing and revising development plans are a measure of just compensation. Defs.' Costs Opp'n (ECF No. 141, at 14). However, they argue that testimony regarding these elements should be permitted as informative of considerations to Ray's ultimate opinion on the value of the property before and after the take. Id. Given that Ray's Report's discussions of entrepreneurial incentive and development costs will be excluded for the reasons explained above, any testimony regarding these elements to provide more information alongside Ray's valuation is no longer relevant. Thus, Landowners' other witnesses and Ray are prohibited from testifying as to alleged development and negotiation costs that are unrecoverable so as to not mislead the jury.

**C.    Colorito's Leased Fee Appraisals Should Be Excluded.**

The United States confirmed that they do not plan to introduce testimony regarding Colorito's leased fee appraisals if the Government's motion to exclude Ray's valuation of Parcel 127 is granted and Ray and the Landowners are not permitted to testify about the value of the existing Starbucks lease. Pl.'s Opp'n (ECF No. 144, at 18). In fact, the Government believes that Colorito's fee simple appraisals use the proper methodology to value Parcel 127, and they only sought to introduce Colorito's lease fee appraisal to disprove any testimony Ray introduces regarding value added by the Starbucks lease. Id. Because the court grants the United States' motion to exclude Ray's testimony referencing elements of the Cost Approach in relation to Parcel 127, Colorito's leased fee appraisal would be irrelevant and should also be excluded. Accordingly, the court does not address the substance of Landowners' motion to exclude this testimony by Colorito.

22

## C.     Colorito's Fee Simple Appraisal Is Admissible.

Landowners criticize Colorito for appraising Parcel 127 "as though [it is] vacant ... for development of the Starbucks quick service restaurant as planned," but not assigning any value to the lease and development approvals. Defs.' Mem. (ECF No. 105, at 10-14). Landowners argue that it is impermissible for an appraiser to ignore a property's lease and approval for development when determining the market value. Id. at 12. They claim Ray should have found a market analog for property with a build-to-suit lease in place with a national credit-worthy tenant. Id. at 14.

However, as mentioned above in the analysis of Ray's appraisal, assigning a standalone value to the development costs incurred and the lease with Starbucks is impermissible for Parcel 127 because it was physically undeveloped, vacant land. Rather, an appraiser should use the Sales Comparison Approach, which Colorito did, because that captures any value inherent to the subject property's potential for development and properly excludes any business losses that are not compensable under the Fifth Amendment. Balaji Sai, 2011 WL 2471586, at *4-5. Colorito properly considered how the lease would affect the land value of Parcel 127 by finding comparable sales of vacant land purchased for development.

Landowners also argue that Colorito's reports do not conform to disclosure standards required by the Uniform Standards of Professional Appraisal Practice ("USPAP") and are thus unreliable. Defs.' Mem. (ECF No. 105, at 15-16). First, they claim Colorito did not provide "clear and conspicuous" statements of the hypothetical conditions used in his appraisal. Id. However, Landowners fails to state what hypothetical conditions were not disclosed. In the event that Landowners believe the before and after method needed to be stated as a hypothetical condition, that is a "conventional method for determining just compensation" that did not need to be disclosed as a hypothetical condition. United States v. 33.92356 Acres, 585 F.3d 1, 9 (1st Cir. 2009). Other

23

hypothetical conditions were explicitly disclosed. See, e.g., Colorito Fee Simple Report at 77 (ECF No. 144-2, at 29) ("Per the legal instructions supplied by the client in Premise 1, the before and after appraised values of the subject property carry with them the hypothetical condition that the existing lease in place as of the effective date of value does not exist."). The lack of examples by Landowners of hypothetical conditions omitted and examples to the contrary in Colorito's Report demonstrates Colorito's compliance with USPAP standards. Thus, Colorito's fee simple appraisal is admissible.

## IV.  CONCLUSION

For the foregoing reasons, the court GRANTS IN PART the United States' Motion to Exclude Ray's Testimony, (ECF No. 106), GRANTS the remaining unresolved portion of the United States's Motion in Limine, (ECF No. 108), and GRANTS IN PART and DENIES IN PART Landowners' Motion to Exclude Colorito's Testimony, (ECF No. 104).

IT IS SO ORDERED.

/s/ _____
Douglas E. Miller
United States Magistrate Judge
DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
July 17, 2026

24